IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

CLERKS OFFICE US DISTRICT COURT
AT HARRISONBURG, VA
FILED
09/04/2026
LAURA A. AUSTIN, CLERK
BY: /s/ Amy Fansler
DEPUTY CLERK

DEISE ALMEIDA ELLSTON, *et al.*,

Plaintiffs,

v.

FREDERICK COUNTY, VIRGINIA, *et al.*,

Defendants.

Civil Action No. 5:25-cv-00120

By: Elizabeth K. Dillon
Chief United States District Judge

## MEMORANDUM OPINION

Plaintiffs Deise Almeida Ellston and William James Ellston (the Ellstons), proceeding pro se, are the parents of E.M.A.G. who at all relevant times was a student at R.E. Aylor Middle School in Frederick County, Virginia. (Compl. ¶¶ 3, 14, Dkt. No. 1.) The Ellstons bring this action against defendants Frederick County, Virginia (Frederick County),[1] Frederick County School Board (FCSB),[2] David Rudy (Principal Rudy), Chance Varner (Assistant Principal Varner), Marcella Simmons (Assistant Principal Simmons), Alexa Rogers (Counselor Rogers), Nicole Riegel Marko (Marko), Jill Couturiaux (Couturiaux), George Hummer (Superintendent Hummer) (collectively the School Defendants), and Steven Smallwood (Deputy Smallwood).

[1] Frederick County is not likely a proper defendant in this matter. Indeed, Frederick County does not have final decision-making power over the schools that it funds. Va. Code § 15.2-403(a) ("The [county] board shall be the policy-determining body of the county . . . ."). In light of the court's conclusions herein, however, it is unnecessary to examine that issue now.

[2] In their complaint, the Ellstons name Frederick County Public Schools (FCPS)—rather than the Frederick County School Board (FCSB)—as a defendant. (Compl. ¶ 5.) FCPS is not a proper defendant because it "is not a recognizable legal entity" that can sue or be sued. *See Thayer v. Wash. Cnty. Sch. Bd.*, 949 F. Supp. 445, 446 n.1 (W.D. Va. 1996) (citing Va. Code § 22.1-295). Instead, pursuant to Virginia law, FCSB is the proper defendant as it is the entity vested with the duty of "supervision of schools in each school division." Va. Cost. Art. VIII, § 7; Va. Code § 22.1-28. Pro se pleadings must be construed "liberally." *Seabrook v. Driscoll*, 148 F.4th 264, 269 (4th Cir. 2025) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)). Accordingly, for purposes of resolving the instant motions to dismiss, the court treats the Ellstons' claims against FCPS as claims against FCSB.

(*Id.* ¶¶ 3–13.) In their complaint, the Ellstons allege multiple claims arising from allegations that defendants failed to properly respond to various incidents involving the Ellstons' minor child, E.M.A.G. (*Id.* ¶¶ 14–58.)

This matter is before the court on the School Defendants' and Deputy Smallwood's respective motions to dismiss. (Dkt. Nos. 6, 12.) For the reasons stated below, the court will grant the School Defendants' and Deputy Smallwood's respective motions and dismiss the Ellstons' complaint without prejudice.

## I. BACKGROUND

The background sets forth the facts as alleged in the complaint, which the court treats as true for purposes of ruling on a motion to dismiss pursuant to either Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6). *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (discussing the Rule 12(b)(1) standard); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (discussing the Rule 12(b)(6) standard).

The Ellstons are the parents of E.M.A.G., a disabled minor enrolled at R.E. Aylor Middle School (the school) in Frederick County, Virginia. (Compl. ¶¶ 3, 14.) E.M.A.G. has been diagnosed with multiple disabilities, "including ADHD, OCD, depression, anxiety and suicidal ideation." (*Id.* ¶ 16.) Instead of implementing an Individualized Education Program (IEP) under the Individuals with Disabilities Education Act (IDEA), FCSB created a 504 plan for E.M.A.G. pursuant to section 504 of the Rehabilitation Act.[3] (*Id.*) FCSB has failed to provide the accommodations mandated by the 504 plan. (*Id.*)

---

[3] "An IEP is a written plan for students with disabilities under the IDEA created to ensure the student receives a free appropriate public education based on their specific needs." *Ja. B. v. Wilson Cnty. Bd. of Educ.*, 61 F.4th 494, 496 n.1 (6th Cir. 2023) (citing 20 U.S.C. § 1414(d)). A section 504 plan, on the other hand, "arises under section 504 of the Rehabilitation Act of 1973 and provides disability accommodations." *Id.* (citing 29 U.S.C. § 794(a)). "A principal difference between section 504 and the IDEA relates to the specific students covered by the statutes." *Id.* (citation omitted). Section 504 defines disability more broadly and in turn generally covers more

During the 2024–2025 academic year, E.M.A.G. was involved in multiple incidents with fellow students and faculty members. On February 5, 2025, Assistant Principal Varner "acknowledged via email" that another student pushed E.M.A.G., but the school took no disciplinary action against the other student. (*Id.* ¶ 20.) That same day, Counselor Rogers completed a "Self-Harm Report," noting that E.M.A.G. had expressed suicidal ideation. (*Id.* ¶ 21.) The report classified the risk as "low." (*Id.*) Shortly thereafter, on March 17, 2025, the school flagged a search conducted by E.M.A.G. on his school-issued computer that similarly raised concern regarding potential suicidal ideations: "what happens if you drink bleach." (*Id.* ¶ 23.) The Ellstons were not notified of either incident. (*Id.* ¶¶ 21–23.)

On April 8, 2025, E.M.A.G. was physically struck multiple times by another student in the school cafeteria resulting in "facial paralysis (Bell's palsy)." (*Id.* ¶ 24.) The incident was captured on video by the school's surveillance cameras. (*Id.* ¶ 25.) The Ellstons contend they were required to file a Freedom of Information Act (FOIA) request to obtain the footage after Deputy Smallwood, a school resource officer, and Assistant Principal Varner "denied immediate access" to it. (*Id.* ¶¶ 24–25.) Following the incident, "E.M.A.G. was isolated in a room for hours" without treatment for his injuries, and the school took no further action. (*Id.* ¶ 25.)

At some point after the April 8, 2025 incident, the Ellstons met with Principal Rudy, Assistant Principal Varner, and Deputy Smallwood to watch the footage. (*Id.* ¶¶ 26–36.) During that meeting, Principal Rudy, Assistant Principal Varner, and Deputy Smallwood "minimized" the incident. (*Id.* ¶¶ 26–29.) Specifically, they stated that E.M.A.G. was the initial aggressor, that there were no injuries to take pictures of, and that "incidents like this 'happen all the time between boys,'" therefore there was no reason to notify the parents or involve law enforcement.

individuals. *Id.* "[T]he IDEA limits its protection to children who have one of the specific disabilities listed in the statute and who need special education and related services as a result of that disability." *Id.* (citation omitted).

(*Id.*) Also during the meeting, the Ellstons informed Principal Rudy, Assistant Principal Varner, and Deputy Smallwood that E.M.A.G. "had been the target of long-standing bullying by the same student" and that the cafeteria incident was provoked by that student making racist and sexually explicit remarks to E.M.A.G. (*Id.* ¶¶ 32–33.) The Ellstons' concerns were "dismissed" and the incident was characterized as "name-calling that happens in middle school." (*Id.* ¶ 33.) The April 8, 2025 incident "exacerbated" E.M.A.G.'s mental health conditions. (*Id.* ¶ 34.)

On April 18, 2025, the Ellstons filed a petition for a protective order against Principal Rudy, Assistant Principal Varner, and Deputy Smallwood in Juvenile and Domestic Relations (JDR) court. (*Id.* ¶ 37.) In their petition, the Ellstons alleged that Principal Rudy, Assistant Principal Varner, and Deputy Smallwood failed to protect E.M.A.G., "engaged in retaliation," falsely accused E.M.A.G. of being the initial aggressor, intimidated the Ellstons, and "denied access to critical evidence." (*Id.*) The request was denied by the JDR court on May 5, 2025. (*Id.* ¶ 38.)

Thereafter, on May 7, 2025, during a meeting with Assistant Principal Simmons, it "became apparent" to Ms. Ellston that the school had given E.M.A.G. lunch detention for throwing a water bottle off a balcony. (*Id.* ¶¶ 39–40.) When Ms. Ellston opined that the disciplinary action was a retaliatory response to the Ellstons' legal proceedings against the school, Assistant Principal Simmons explained that giving E.M.A.G. lunch detention was a response to E.M.A.G. admitting he had thrown the water bottle. (*Id.* ¶¶ 40, 42.) Ms. Ellston "emphasized that, according to" E.M.A.G.'s 504 plan, he "should not be subjected to punishment without considering his disability and the necessary accommodations outlined for his condition." (*Id.* ¶¶ 43–44.) Ms. Ellston's concerns were ignored by Assistant Principal Simmons. (*Id.* ¶ 44.)

On May 9, 2025, Marko, a volunteer with FCSB, called E.M.A.G. a "dangerous student" on social media. (*Id.* ¶ 45.) Although Marko received a cease-and-desist letter, her statements remained online and FCSB allowed her to continue volunteering. (*Id.* ¶ 46.) Additionally, at some point in May 2025, Principal Rudy "prohibited" E.M.A.G. from speaking Portuguese at school or on the phone with Ms. Ellston, citing concerns about what E.M.A.G. "says about [him]." (*Id.* ¶ 47.) During this time, the Ellstons submitted multiple written requests to Superintendent Hummer demanding that Principal Rudy, Assistant Principal Varner, and Marko be suspended or removed, but no action was taken. (*Id.* ¶ 49.)

In September and October 2025, E.M.A.G. had multiple physical altercations with "Student B." (*Id.* ¶¶ 52–54.) On September 10, 2025, Student B pushed and slapped E.M.A.G. in the school hallway without provocation. (*Id.* ¶ 52.) The Ellstons contend that E.M.A.G. "reported prior similar incidents involving the same student during the week of September 5–7[.]" (*Id.*) Around September 15, 2025, E.M.A.G. was put on "a stronger psychotropic medication regimen in response to a worsening of anxiety, depression, and school-related distress." (*Id.* ¶ 57.) On October 9, 2025, Student B and E.M.A.G. had a verbal exchange in between classes that escalated to a physical fight. (*Id.* ¶ 53.) According to the Ellstons, "Student B slapped E.M.[A.]G. in the face, prompting E.M.[A.]G. to push the student away." (*Id.*) E.M.A.G. submitted a written statement "documenting the unprovoked aggression and identifying a pattern of violence from [Student B]." (*Id.*) FCSB did not discipline Student B and took no action to ensure such altercations did not happen again. (*Id.* ¶¶ 52–54.)

On October 14, 2025, the Ellstons "demanded accountability" from the school for the October 9, 2025, incident. (*Id.* ¶ 56.) That same day, two male students accused E.M.A.G. of climbing onto a toilet to look over the stall divider in the school bathroom. (*Id.* ¶ 55.) The

school classified E.M.A.G.'s behavior as "lewd or indecent behavior" in violation of the student handbook. (*Id.*) On October 15, 2025, the school issued a formal notice to Ms. Ellston notifying her that E.M.A.G. would serve "In-School Assistance (ISA)" because of his conduct. (*Id.* ¶ 56.)

The Ellstons have withdrawn E.M.A.G. from FCSB because of these incidents. (*Id.* ¶ 51.) Based on these incidents, the Ellstons list 18 "legal bas[e]s" which the court construes as causes of action.[4] The court lists them below (using the Ellstons' titles) with a summary of the facts underlying each as best it can discern. For clarity, the court assigns each claim a count number.

| **Count** | **Cause of Action** | **Named Defendant(s)** | **Nature of the Claim** |
| --- | --- | --- | --- |
| Count 1 (Compl. ¶ 59) | "Willful or wanton conduct" (negligence) | Principal Rudy; Assistant Principal Varner; Deputy Smallwood; Assistant Principal Simmons; Couturiaux | The named defendants recklessly disregarded E.M.A.G.'s safety and constitutional rights by "ignoring reports of bullying, minimizing a physical assault, and imposing retaliatory discipline despite the child's 504 protections." (*Id.*) |
| Count 2 (Compl. ¶ 60) | "Americans with Disabilities Act (ADA), 42 U.S.C. § 12132" | Couturiaux; FCSB | FCSB denied E.M.A.G. access to public education based on his disability by failing to implement his required accommodations. (*Id.*) Further, FCSB's failure to update E.M.A.G.'s accommodations in response to the change in his medical and psychiatric treatment violated his rights under the ADA. (*Id.*) Couturiaux violated the ADA by punishing E.M.A.G. on October 31, 2025,[5] without first reviewing whether the punished conduct was a manifestation of E.M.A.G.'s disabilities and without notifying the Ellstons. (*Id.*) |

[4] The Ellstons also allege that FCSB failed to provide E.M.A.G. with an IEP under the IDEA. (Compl. ¶ 17.) The Ellstons do not, however, raise the IDEA as a legal basis underlying their action. Neither the School Defendants' nor Deputy Smallwood's motion to dismiss construes the complaint as containing a claim under the IDEA, and the Ellstons do not assert that they are making a claim under the IDEA in their responses. Accordingly, the court does not construe the Ellstons' complaint as alleging a violation of the IDEA.

[5] The Ellstons do not include details about what the October 31, 2025 punishment entailed, and Couturiaux is not mentioned in the factual allegations.

| | | | |
|---|---|---|---|
| Count 3 (Compl. ¶ 61) | "Section 504 of the Rehabilitation Act – 29 U.S.C. § 794" | FCSB; Principal Rudy; Assistant Principal Varner | The named defendants deprived E.M.A.G. meaningful access to education. (*Id.*) Specifically, FCSB failed to adequately implement E.M.A.G.'s 504 plan and conduct periodic reviews or reevaluations. (*Id.*) Principal Rudy and Assistant Principal Varner disregarded E.M.A.G.'s 504 plan by disciplining him for behavior directly related to his disabilities. (*Id.*) |
| Count 4 (Compl. ¶ 62) | "Title 45 CFR 84.71" | FCSB "officials and staff" | FCSB "officials and staff" retaliated against the Ellstons for their complaints of discrimination, "exercise of rights under the 504 [p]lan, and parental advocacy" by "increase[ing] disciplinary scrutiny, exclu[ding] from services, and hostile treatment." (*Id.*) |
| Count 5 (Compl. ¶ 63) | "Family Educational Rights and Privacy Act (FERPA) – 20 U.S.C. § 1232g" | Marko | Marko's social media post calling E.M.A.G. a "dangerous student" constituted a public disclosure of confidential student information in violation of E.M.A.G.'s privacy rights under FERPA. (*Id.*) |
| Count 6 (Compl. ¶ 64) | "Virginia Code § 22.1-272.1 – Parental Notification of Suicide Risk" | Counselor Rogers | Counselor Rogers violated the Ellstons' rights by failing to immediately notify them after documenting E.M.A.G.'s suicidal ideation. (*Id.*) |
| Count 7 (Compl. ¶ 65) | "Violation of Virginia Code § 22.1-279.1:1 – Unlawful Use of Seclusion and Restraint" | FCSB; Counselor Rogers; Assistant Principal Varner; Principal Rudy | The named defendants unlawfully secluded E.M.A.G. without proper parental notification, documentation, evidence of imminent danger, or consideration of E.M.A.G.'s disability. (*Id.*) |
| Count 8 (Compl. ¶ 66) | "Virginia Code § 22.1-279.3(C)" | Principal Rudy; Assistant Principal Varner; "other teachers" | The named defendants violated the Ellstons' rights under the U.S. Constitution and Virginia law to challenge school disciplinary measures by disciplining E.M.A.G. without first notifying the Ellstons and receiving their authorization. (*Id.*) |
| Count 9 (Compl. ¶ 67) | "Violations of Virginia Code §§ 22.1-279.3:1; 22.1-79.4; 18.2-57 – | Principal Rudy; Assistant Principal Varner; Deputy Smallwood; Couturiaux | After E.M.A.G. was slapped on April 8, 2025, the named defendants failed to promptly report the incident and initiate threat assessment protocols in violation of Va. Code §§ 22.1-279.3:1, 22.1-79.4. (*Id.*) |

| | | | |
|---|---|---|---|
| | Assault and Battery Response, Threat Assessment, and Mandatory Reporting Failures" | | Additionally, the named defendants failed to report the incident to law enforcement and take disciplinary action against the aggressor in violation of Va. Code § 18.2-57. (*Id.*) Further, the named defendants failed to promptly notify the Ellstons and failed to comply with reporting procedures for other incidents involving students bullying E.M.A.G. (*Id.*) |
| Count 10 (Compl. ¶ 68) | "First Amendment Violation" | FCSB; Principal Rudy | FCSB and Principal Rudy failed to protect E.M.A.G. "from hostile and abusive speech" that would violate Va. Code § 8.01-45 by "willfully ignor[ing], trivializ[ing], or dismiss[ing] sexually explicit, racially motivated, and xenophobic verbal attacks directed at E.M.A.G." (*Id.*) Such failure violated E.M.A.G.'s rights under "Title VI of the Civil Rights Act, Section 504 of the Rehabilitation Act, and the First Amendment." (*Id.*) |
| Count 11 (Compl. ¶ 69) | "Fourteenth Amendment Violation – Equal Protection Clause" (under 42 U.S.C. § 1983) | Frederick County; FCSB; Deputy Smallwood | The named defendants violated E.M.A.G.'s right to equal protection under the Fourteenth Amendment by "enforcing disciplinary policies in a disparate and unjust manner." (*Id.*) |
| Count 12 (Compl. ¶ 70) | "42 U.S.C. § 1983 – Civil Rights Violations Under Color of State Law" | "Defendants" | Defendants "violated E.M.A.G.'s constitutional rights to bodily integrity, access to public education, and due process" by failing to report physical altercations, failing to notify the Ellstons, and failing to abide by E.M.A.G.'s documented accommodations. (*Id.*) |
| Count 13 (Compl. ¶ 71) | "Title VI of the Civil Rights Act – 42 U.S.C. § 2000d" | "Defendants" | Defendants violated E.M.A.G.'s rights under Title VI of the Civil Rights Act by not addressing and preventing language- and ethnic-based harassment and "retaliating against him for speaking Portuguese with his mother by phone." (*Id.*) |
| Count 14 (Compl. ¶ 72) | "Virginia Code § 22.1-291.4 – Bullying Prevention | FCSB | FCSB violated E.M.A.G.'s rights by failing to comply with state law requiring bullying prevention training and reporting. (*Id.*) |

| | | | |
|---|---|---|---|
| | Training and Reporting” | | |
| Count 15 (Compl. ¶ 73) | “Virginia Code § 22.1-279.6 – Board of Education guidelines and model policies” | FCSB | FCSB violated E.M.A.G.’s rights by failing “to enforce its own Student Code of Conduct provisions, which—pursuant to § 22.1-279.6(C)—require clear prohibitions against hazing, verbal abuse, and obscene language or conduct.” (*Id.*) |
| Count 16 (Compl. ¶ 74) | “Harassment and Intimidation in Violation of Section 504, Title VI, and 42 U.S.C. § 1983” | Deputy Smallwood; Assistant Principal Varner; Assistant Principal Simmons; Principal Rudy | The named defendants “engaged in a sustained course of conduct that subjected [E.M.A.G.] to a hostile, intimidating, and discriminatory educational environment” by minimizing violent incidents, refusing to acknowledge safety threats, and misrepresenting documented assaults. (*Id.*) |
| Count 17 (Compl. ¶ 75) | “Virginia Code § 22.1-292 (2023); § 22.1-315; and 8VAC20-23-740 Mandatory Suspension for Staff Misconduct” | FCSB | FCSB failed to comply with the aforementioned state statutes by failing to suspend, remove, or reassign Principal Rudy, Assistant Principal Varner, and Marko. (*Id.*) Such failure “deprived the student population of protection designed to safeguard welfare under the statute.” (*Id.*) |
| Count 18 (Compl. ¶ 76) | “Virginia Code § 8.01-45 – Civil Defamation & Virginia Code § 18.2-152.7:1 – Harassment by Computer” | Marko | Marko’s social media post calling E.M.A.G. a “dangerous student” was defamatory and constituted criminal harassment by computer and stalking of a minor. (*Id.*) |

Additionally, the Ellstons list in paragraph 77 of their complaint what appears to be an incomplete claim: “34 CFR § 300.530 – Authority of school personnel. (f) Determination that behavior was a manifestation. If the LEA, the parent, and relevant members of the IEP Team make the determination that the conduct was a manifestation of the child’s disability, the IEP

team must[.]" (*Id.* ¶ 77.) The court cannot discern the nature of this claim, and no party raises it in briefing. Accordingly, the court declines to analyze it further.

The Ellstons seek $42 million in compensatory damages against Frederick County and FCSB. (*Id.* ¶ 78.) Additionally, the Ellstons seek $350,000 in punitive damages for the willful misconduct, retaliation, and deliberate indifference of Superintendent Hummer, Principal Rudy, Assistant Principal Varner, Assistant Principal Simmons, Counselor Rogers, Marko, Couturiaux, and Deputy Smallwood. (*Id.* ¶ 79.) The Ellstons also seek an injunction requiring FCSB to terminate the employment of Principal Rudy, Assistant Principal Varner, Marko, Counselor Rogers, and Superintendent Hummer. (*Id.* ¶¶ 80–81.) Deputy Smallwood and the School Defendants each filed a motion to dismiss the instant action in its entirety. (Dkt. Nos. 6, 12.)

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(1)

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a defendant may move for dismissal for lack of subject matter jurisdiction. When a defendant asserts that the plaintiff has failed to allege facts sufficient to establish subject matter jurisdiction, the allegations in the complaint are assumed to be true under the same standard as in a Rule 12(b)(6) motion, and "the motion must be denied if the compliant alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192. When a defendant asserts that facts outside of the complaint deprive the court of jurisdiction, the court "may consider evidence outside of the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). Only when "the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law" should a court grant a Rule 12(b)(1) motion. *Evans v. B.F.*

*Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999) (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). "The plaintiff bears the burden of" establishing the existence of subject matter jurisdiction. *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995) (citation omitted).

**B. Federal Rule of Civil Procedure 12(b)(6)**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's allegations must "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard "requires the plaintiff to articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief, i.e., the 'plausibility of entitlement to relief.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). Although "[t]he plausibility standard is not akin to a 'probability requirement,'" it requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "[A] formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

In applying the plausibility standard, the "court must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Langford v. Joyner*, 62 F.4th 122, 124 (4th Cir. 2023) (citation omitted). The court, however, "need not accept legal conclusions couched as facts or 'unwarranted inferences, unreasonable conclusions, or arguments.'" *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

## III. ANALYSIS

**A. The Ellstons Cannot Litigate Claims Belonging to E.M.A.G.**

In their motion to dismiss, the School Defendants contend that many of the Ellstons' claims are brought on behalf of E.M.A.G. and, therefore, cannot be litigated by the Ellstons pro se. (Br. Supp. School Defs.' Mot. to Dismiss 9, Dkt. No. 13.) The Ellstons do not dispute this and instead merely argue that they have a right to litigate their own claims pro se. (Br. Opp. School Defs.' Mot. to Dismiss 2, Dkt. No. 15.) The court agrees.

"An individual unquestionably has the right to litigate his *own* claims in federal court." *Myers v. Loudoun Cnty. Pub. Schs.*, 418 F.3d 395, 400 (4th Cir. 2005) (citing 28 U.S.C. § 1654). That right, however, "does not create a coordinate right to litigate for *others*." *Id.* (citing *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975)). Applying this rule, the Fourth Circuit has held that "non-attorney parents generally may not litigate the claims of their minor children in federal court." *Id.* at 401 (citations omitted); *see also M.D. v. Sch. Bd. of City of Richmond*, 560 F. App'x 199, 200 (4th Cir. 2014) ("[N]on-attorney parents are not authorized to represent their children pro se in federal court[.]").

Here, the Ellstons are not merely attempting to assert E.M.A.G.'s claims. Rather, the Ellstons—who are not attorneys—seek to litigate E.M.A.G.'s claims pro se. Because the Ellstons assert that some of the claims at issue belong to them, rather than to E.M.A.G., it is helpful at this juncture to define precisely whose rights are alleged to have been violated in each count of the complaint. Counts 1, 2, 3, 5, 7, 10, 11, 12, 13, 14, 15, 16, and 18 invoke only E.M.A.G.'s name, the duties owed to him, and alleged violations of his rights. (Compl. ¶¶ 59–61, 63, 65, 68–74, 76.) Similarly, the Ellstons do not allege a violation of their rights in Count 17 but instead raise a purported violation of the rights of "the student population" due to FCSB's

failure to suspend, remove, or reassign Principal Rudy, Assistant Principal Varner, and Marko. (*Id.* ¶ 75.) Because Counts 1–3, 5, 7, and 10–18 do not allege a violation of the Ellstons' rights, the Ellstons cannot litigate those claims pro se.

Count 9 raises claims of both E.M.A.G. and the Ellstons. (*Id.* ¶ 67.) Indeed, in Count 9, the Ellstons allege that after E.M.A.G. was slapped on April 8, 2025, Principal Rudy, Assistant Principal Varner, Deputy Smallwood, and Couturiaux failed to report the incident promptly, initiate standard protocols, report the incident to law enforcement, and take disciplinary action against the alleged aggressor. (*Id.*) These claims merely allege violations of E.M.A.G.'s rights. Count 9, however, also includes a claim that the school "withheld timely parent notification." (*Id.*) Accordingly, the Ellstons may litigate the portion of Count 9 that alleges they were not promptly notified after their minor son was involved in a physical altercation at school.[6] Similarly, Counts 6 and 8 allege different ways in which the Ellstons' right to notice of issues concerning their minor child was violated. (*Id.* ¶¶ 64, 66.) Counts 6, 8, and 9, therefore, assert violations of the Ellstons rights and can be litigated by them pro se.

Finally, the School Defendants characterize Count 4 as belonging solely to E.M.A.G. and, therefore, argue that the Ellstons are similarly barred from litigating that claim. (Br. Supp. School Defendant's Mot. to Dismiss 6, 9.) The court disagrees. Indeed, in Count 4 the Ellstons allege that their right to advocate for E.M.A.G. was violated by the retaliatory conduct of FCSB "officials and staff." (Compl. ¶ 62.) Accordingly, the Ellstons have a right to litigate Count 4 on their own behalf.

[6] In his motion to dismiss, Deputy Smallwood characterizes Count 9 as a claim that he failed to criminally investigate and prosecute the other student involved in the April 8, 2025 physical altercation. (Br. Supp. Deputy Smallwood's Mot. to Dismiss 7–8, Dkt. No. 7.) According to Deputy Smallwood, the Ellstons lack standing to bring such a claim. (*Id.* at 7–9.) Count 9 does allege a failure "to file mandatory reports to law enforcement" and a violation of Virginia's criminal assault and battery statute based on the failure to take disciplinary action against the alleged aggressor. (Compl. ¶ 67.) Because the court concludes that these are claims of E.M.A.G. that cannot be litigated by his parents proceeding pro se, there is no need to address Deputy Smallwood's standing argument.

In sum, because Counts 1–3, 5, 7, and 10–18 do not allege violations of the Ellstons' rights, the Ellstons cannot pursue those claims pro se. Accordingly, Counts 1, 2, 3, 5, 7, 10, 11, 12, 13, 14, 15, 16, 17, and 18 will be dismissed without prejudice. That leaves only Counts 4, 6, 8, and the portion of Count 9 alleging that they were not promptly notified after their minor son was involved in a physical altercation at school.

**B. The Ellstons Fail to State a Claim Under 45 C.F.R. 84.71(a) in Count 4.**

In Count 4, the Ellstons allege that FCSB "officials and staff" violated 45 C.F.R. § 84.71(a) by retaliating against the Ellstons "following protected activity, including internal complaints regarding discrimination, the exercise of rights under the 504 [p]lan, and parental advocacy." (*Id.*) According to the Ellstons, "[t]he retaliatory actions" taken by FCSB "officials and staff" include "increased disciplinary scrutiny, exclusion from services, and hostile treatment." (*Id.*)

As an initial matter, the court notes that Count 4 does not provide details regarding precisely which "individuals and staff" retaliated against the Ellstons, and the court's review of the complaint does not provide much clarity. Regarding increased disciplinary scrutiny, the Ellstons allege that E.M.A.G. received lunch detention "as a form of retaliation." (*Id.* ¶ 39.) Although Ms. Ellston became aware of E.M.A.G.'s lunch detention during a conversation with Assistant Principal Simmons, the Ellstons do not allege that Assistant Principal Simmons imposed the punishment. (*Id.*) Instead, the Ellstons contend "that *the school* was applying a lunch detention to [E.M.A.G.] as a form of retaliation." (*Id.* (emphasis added).) Additionally, the Ellstons allege that E.M.A.G. received "In-School Assistance" as a retaliatory punishment "based on unverified allegations" that E.M.A.G. looked over the stall divider in a school bathroom. (*Id.* ¶¶ 55–56.) Again, the Ellstons do not attribute this alleged retaliatory

punishment to any specific individual but instead claim that "the school" imposed the punishment. (*Id.*) Similarly, it is unclear what conduct the Ellstons are referring to as constituting "exclusion from services" and "hostile treatment." (*Id.* ¶ 62.)

Aside from the factual insufficiency of Count 4, the Ellstons have fallen short of establishing they are entitled to relief under 45 C.F.R. § 84.71. That regulation, entitled "[r]etaliation or coercion" provides:

> (a) A recipient shall not discriminate against any individual because that individual has opposed any act or practice made unlawful by this part, or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under section 504 or this part.
>
> (b) A recipient shall not coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of their having exercised or enjoyed, or on account of their having aided or encouraged any other individual in the exercise or enjoyment of any right granted or protected by section 504 of this part.

45 C.F.R. § 84.71.

Titled "Public Welfare," title 45 of the Code of Federal Regulations is comprised of regulations promulgated by agencies related to human services and public welfare. Subtitle A of title 45 contains regulations issued by the Department of Health and Human Services (HHS). Part 84 of subtitle A "applies to each recipient of Federal financial assistance from the Department [of Health and Human Services] and the recipient's programs or activities that involve individuals with disabilities in the United States." 45 C.F.R. § 84.2(a). The prohibition against retaliation embodied in 45 C.F.R. § 84.71, therefore, only applies to entities receiving federal funds from HHS. The Ellstons do not allege that FCSB is a recipient of HHS funding. Although there may be another regulation, rule, or statute that prohibits similar conduct by schools receiving funding from other federal agencies, 45 C.F.R. § 84.71 does not. Accordingly,

the Ellstons have not stated a claim upon which relief can be granted and Count 4 must be dismissed without prejudice.

**C. The Ellstons Have Not Properly Alleged a Violation of Their Liberty Interest in the Care, Custody, and Control of E.M.A.G.**

Although the Ellstons' label Count 8 as solely a violation of Virginia law, that count goes on to allege a violation of "the [] interest of parents in the care, custody, and control of their children." (Compl. ¶ 66) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Specifically, the Ellstons allege that despite multiple written requests, FCSB, Principal Rudy, Assistant Principal Varner, and "other[] teachers" continued to "remove," "isolate[]," and "penalize[]" E.M.A.G. without "due process or proper parental engagement." (*Id.*) In other words, the Ellstons contend that their constitutional rights as parents were violated when their request that no disciplinary action be taken against E.M.A.G. without Ms. Ellston's "express authorization" was denied. (*Id.*) The School Defendants argue that, although parents have a "fundamental right to make decisions concerning the care, custody, and control of their child," that right does not preclude schools from disciplining students without first providing notice and obtaining the consent of the parents. (Br. Supp. School Defendant's Mot. to Dismiss 18.) The Ellstons do not address the School Defendants' argument in response.

The court construes this count as asserting both federal and state-law claims. As for the federal claim, the Supreme Court has recognized that the Due Process Clause of the Fourteenth Amendment encompasses a "fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66 (collecting cases). The boundaries of that right, however, have never been defined. *See Bailey v. Va. High Sch. League, Inc.*, 488 F. App'x 714, 716 (4th Cir. 2012) (quoting *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 182 (3d Cir. 2005)) (noting that the Supreme Court has never defined "the precise boundaries of a

parent's right to control a child's upbringing and education"). What is clear, however, is that the right is "neither absolute nor unqualified." *Id.* (citing *Lehr v. Robertson*, 463 U.S. 248, 256 (1983)).

The Sixth Circuit has described these limitations in the context of public schools:

> While parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child. Whether it is the school curriculum, the hours of the school day, school discipline, the timing and context of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school or[] . . . a dress code, these issues of public education are generally "committed to the control of state and local authorities."

*Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395–96 (6th Cir. 2005) (quoting *Goss v. Lopez*, 419 U.S. 565, 578 (1975)).

Notably, the Fourth Circuit has repeatedly held that schools have "substantial leeway" to maintain discipline in the classroom. *Wofford v. Evans*, 390 F.3d 318, 323 (4th Cir. 2004); *Hall v. Tawney*, 621 F.2d 607, 610 (4th Cir. 1980) ("The state interest in maintaining order in the schools limits the rights of particular parents unilaterally to except their children from the regime to which other children are subject."); *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 788 (4th Cir. 2023) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969)) (reiterating the authority of schools "to prescribe and control conduct in schools").

This authority demonstrates that the Ellstons' right to the care, custody, and control of E.M.A.G. was not violated by the denial of Ms. Ellston's request that E.M.A.G. not be subjected to discipline without her express authorization. Such a request is no more than an attempt "to except" E.M.A.G. "from the regime to which other children are subject," and she does not have

that right. *Hall*, 621 F.2d at 610. Accordingly, the portion of Count 8 alleging a constitutional violation is dismissed without prejudice.

**D. The Court Declines to Exercise Supplemental Jurisdiction Over the Remaining State Law Claims.**

Based on the foregoing discussion, the only remaining claims are Count 6, the balance of Count 8, and Count 9, each of which invokes only Virginia law. (Compl. ¶¶ 64, 66, 67.) Relevant here, federal district courts have original jurisdiction over cases "arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, and "civil actions where the matter in controversy exceeds the sum or value of $75,000" and there is complete diversity of citizenship among the parties, 28 U.S.C. § 1332(a). "A district court may exercise supplemental jurisdiction 'over all other claims that are so related to claims in the action within [its] original jurisdiction that they form part of the same case or controversy.'" *Henderson v. Harmon*, 102 F.4th 242, 251 (4th Cir. 2024) (quoting 28 U.S.C. § 1367(a)). Even so, the court "may decline to exercise supplemental jurisdiction when it 'has dismissed all claims over which it has original jurisdiction.'" *Id.* (quoting 28 U.S.C. § 1367(c)). Typically, "when a district court dismisses all federal claims in the early stages of litigation"— such as at the motion to dismiss stage—"it should decline to exercise jurisdiction over any remaining pendent state law claims by dismissing those claims without prejudice." *Banks v. Gore*, 738 F. App'x 766, 773 (4th Cir. 2018), *cert. denied*, 586 U.S. 1208 (2019) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)). Because the present case is in its early stages, the court declines to exercise supplemental jurisdiction over Count 6, the state-law claims in Count 8, and Count 9. The court, therefore, dismisses Counts 6, 8, and 9 without prejudice.

## IV. CONCLUSION

The Ellstons cannot litigate the claims of their minor child pro se, so the claims raised on behalf of E.M.A.G. must be dismissed without prejudice. Further, the Ellstons do not properly state a claim for retaliation in violation of 45 C.F.R. 84.71, so Count 4 must also be dismissed without prejudice. To the extent Count 8 is intended to assert a federal claim, that claim fails for the reasons discussed. The court declines to exercise supplemental jurisdiction over the remaining state-law claims, so the Ellstons' case may not proceed and will be dismissed without prejudice in its entirety. Deputy Smallwood's and the School Defendant's motions to dismiss (Dkt. Nos. 6, 12) will be granted.

If the Ellstons want to amend, they shall file a proposed amended complaint not later than thirty days after entry of this order. The amended complaint may include the claims of E.M.A.G., provided the Ellstons obtain counsel. Otherwise, they may include only claims asserting their own rights, if they believe they can remedy the defects the court has identified. Any proposed amended complaint must be a new pleading, complete in all respects, which stands by itself without reference to the original filed complaint. Alternatively, the Ellstons may file a notice declining to amend, in which case the court will enter a final judgment, which would allow the Ellstons to file an immediate appeal to the United States Court of Appeals for the Fourth Circuit. *See Britt v. DeJoy*, 45 F.4th 790, 796 (4th Cir. 2022) (explaining that a party may not appeal from an order that dismisses claims without prejudice and grants leave to amend). A consistent order will be issued.

Entered: September 4, 2026.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
Chief United States District Judge